# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| United States of America, | |
| v. | Case No. 2:16-CR-84 JVB |
| Artez Brewer | |

## OPINION AND ORDER

Defendant Artez Brewer moved to suppress various evidence the government may use against him at trial on bank robbery charges. The Court held an evidentiary hearing and the parties briefed the issues. Having considered the evidence and the parties' arguments, the Court denies Defendant's motions to suppress.

### A. Factual Background

Beginning in February 2016, the government began suspecting that Defendant and his co-defendant, Robin Pawlak, were involved in a series of bank robberies. On April 28, Centier Bank in Griffith was robbed and, on May 6, the Main Source Bank in Crown Point was robbed. Before each of these robberies, a young black man would come into the bank making unusual requests. On May 27, the Horizon Bank in Whiting was robbed, and the FBI investigators, noticing the pattern from the previous two robberies asked one of the employees if she observed anything unusual before the robbery. The employee told the investigators that the day before the robbery a young black man came in near closing time asking about gold coins. The man didn't make any transactions at the bank. The employee said she took a good look at the man because he acted suspiciously and said she would be able to recognize him in the future. The agents then showed the employee images from surveillance videos related to the earlier bank robberies and the

1

employee identified the person in the images as the same person who inquired about the gold coins. The agents then secured the image of the person who came to inquire about the gold coins from the surveillance video of the Horizon Bank. The image was distributed to area law enforcement officers and one of them recognized the person in the image as Defendant.

As a result of the FBI's investigation, on June 2, 2016, the government sought and obtained warrants from an Indiana judge to install GPS tracking devices on four cars associated with Defendant, including a silver Volvo. The warrant limits the tracking of the cars to Indiana territory.

A few days after the GPS tracker was installed on the Volvo, Defendant and Pawlak began driving the car to Los Angeles, and the government continued tracking the car. Along the way, on June 7, they were stopped in Omaha by an Omaha criminal interdiction police officer, Jeffrey Vaughn. The stop had nothing to do with the bank robbery investigation; rather, Officer Vaughn saw the Volvo drive twice for a second or two over the white lane dividers separating the lanes. Officer Vaughn believed that Defendant, the driver of the car, violated Nebraska law requiring drivers to maintain a single lane of traffic, Nebraska State Statute 60-6, 139 (". . . a vehicle shall be driven as nearly as practicable within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety . . .").

Officer Vaughn, who has been a police officer for almost twenty years, is a police dog handler and assists with narcotics investigations. He also patrols highways in Omaha, looking for persons involved in criminal activity. When Officer Vaughn approached Defendant's car, he smelled perfume emanating from the car.

To avoid being hit by passing vehicles, Officer Vaughn told Defendant to come to his police car. He asked Defendant where he was coming from and where he was going and for what

purpose. (He later asked Pawlak the same questions and received inconsistent answers from her.) While waiting on the dispatcher to check out Defendant's driver's license and to determine if any warrants were outstanding for him, Officer Vaughn took out his dog, Nacho, to sniff around the Volvo. While he was walking Nacho around the front of the car, Nacho got excited, moving faster toward the driver's window. Once there, it lifted its nose toward the open driver window and sat down, thus alerting Officer Vaughn to the odor of narcotics.

After this, Officer Vaughn called for additional officers and once they arrived, the car was searched. Officer Vaughn could smell marijuana but no actual drugs were found.

Meanwhile, FBI Special Agent Michael Peasley had been monitoring Defendant's drive across the country. He became concerned when he saw that the car had stopped for a prolonged time on a highway in Omaha. Concerned that Defendant was stopped by police and that his investigation might be derailed, Agent Peasley contacted Special Agent Hallock in Omaha and asked him to drive to the location where Defendant was stopped. Agent Peasley asked Agent Hallock to take pictures if certain items were found in the car. After about an hour and a half from the moment Defendant was stopped, he was let go with just a warning ticket.

Soon after their arrival in Los Angeles, on June 10, Defendant and Pawlak began staking out a bank to rob. Agent Peasley, seeing GPS indications that the Volvo was near a bank, alerted the FBI in Los Angeles about a possible plan to rob the bank. Defendant and Pawlak did indeed rob the bank but the FBI was ready for them and they were arrested.

Defendant was then interviewed by Special Agent Jonathan Bauman and Detective Joseph Harris. Agent Bauman read Defendant his *Miranda* rights, to which he responded "[y]ou know we don't sign shit like this, right?" (Gov't Exh. B at 8). The following exchange ensued:

> Agent Bauman: Well, if you want to talk, without signing anything, we can do that. I just—you got to tell us that it's okay to talk.

> Artez Brewer: Sure. I can talk—what you want to know but shit, I'm—aint' gon' sign nothing, bro, cause I ain't—hey, you know. Come on, man. You know better than that.
>
> Agent Bauman: Okay. Well, then what I'll do is I'll fill it out, and say you refused to sign, but we're gonna talk to you.
>
> Artez Brewer: Okay. That's fine, yeah.
>
> Agent Bauman: Okay?
> Artez Brewer: Yeah; okay. Sure.

(*Id.* at 8–9.)

About a minute later, Agent Bauman again confirmed that Defendant wanted to speak with them:

> Agent Bauman: So you refused to sign. We read you your rights, but you're willing to talk to us. You just don't want to sign the paper; right?
> Artez Brewer: Yeah.

(*Id.* at 10.)

As the interview continued, Defendant made the following statements at one point or another:

"I don't want to say about what happened today." (*Id.* at 15.)

"I ain't trying to talk about shit. Book me. Take me downstairs and do what the fuck y'all gotta do. Take me to court. Whatever. Do what I gotta do. Y'all ain't gonna incriminate me on this shit." (*Id.* at 39.)

"Nah. We ain't talking." (*Id.* at 40.);

"Just book me man." (*Id.* at 52.)

"It doesn't matter, man. Nah, it doesn't matter. It doesn't matter. It doesn't matter. Come on. It doesn't matter. Just book me, book me, get me a car, whatever, just go about my life." (*Id.* at 55.)

Defendant was interviewed again the next day (June 11) by Agent Peasley. Agent Peasley read Defendant the *Miranda* rights and continued:

Agent Peasley: Okay. Having those rights in mind, do you want to talk to me?
Artez Brewer : No.

Agent Peasley: You don't want to answer any questions?
Artez Brewer: Uh-uh. (Negative response).

Agent Peasley: You don't want to talk to me at all, about anything?
Artez Brewer: What is there to talk about? (Inaudible)

Artez Brewer: Take me back upstairs if that's what you have to do.
Agent Peasley: I'm sorry. I did not hear you.
Artez Brewer: You can take me back upstairs. That's what you all can do.

Agent Peasley: So you don't want to talk to me?
Artez Brewer: Nothing to talk about after yesterday.

Agent Peasley then answers that he didn't want to talk about the same subject matter as Agent Bauman did the day before but about Indiana, which piqued Defendant's interest. Agent Peasley told Defendant that he was from Indiana and that he was going to fly home if Defendant didn't want to talk to him. After some hesitation, Defendant indicated that he would talk but that he wouldn't sign the *Miranda* statement. As during the previous interview, as the conversation continued, Defendant made some incriminating statements.

B. Discussion

*(1) GPS Location Tracker*

Defendant wants to suppress from trial any evidence derived outside of Indiana as a result of the GPS tracking device being placed on the silver Volvo. Defendant maintains that, while the warrant was issued properly, it authorized the car to be tracked within Indiana only and, once it left the state, the government should have applied for a new warrant if the agents intended to keep tracking the car. According to Defendant, "[l]aw enforcement, ignoring the limitations placed on the authorization of that search, exercised unfettered and unconstitutional discretion in flagrantly expanding the search over numerous jurisdictions and thousands of miles without the permission or authorization of a neutral magistrate as required by the Fourth Amendment." (DE

5

94, Df.'s Br. at 2.) Defendant accuses the government of using cases that predate *United States v. Jones*, 565 U.S. 400 (2012) (holding that "the Government's installation of GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search'") to justify its position.

The government, on the other hand, argues that the territorial limitation in the warrant applied at best only to Indiana law enforcement officers, not the FBI agents. The government submits that only evidence obtained in violation of the Constitution or federal law is inadmissible, but not evidence that merely violates state law.

The government does rely on some cases that came before *Jones* but they are consistent with *Jones*. For example, *United States v. Simms*, 385 F.3d 1347 (11th Cir. 2004), while decided before *Jones*, dealt with a car-tracking device that was installed on a suspect's car pursuant to a court order. The order limited the tracking of the car to the territory of Texas but the officers used information obtained from the tracking device in Alabama. Defendant Simms argued that the police exceeded the scope of the search but the Court of Appeals for the Eleventh Circuit disagreed:

> Even if we assume that the use of the tracking device beyond the bounds of the warrant may have violated Texas state law governing the installation and use of mobile tracking devices, this still leaves us several steps away from being able to reach a conclusion that suppression is warranted. As we have earlier noted, "constitutional considerations, rather than the demands of state law, direct our resolution of this issue." *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir.1991). The use of the tracking device outside the scope of the warrant simply does not implicate federal constitutional concerns, and there is therefore no "taint" for purposes of applying the exclusionary rule.

*Simms*, 385 F.3d at 1355–56.

The Court agrees with this reasoning. The warrant in this case, and there's no dispute that it was based upon probable cause, authorized the tracking (the search) of the silver Volvo. For Constitutional purposes, that gave the FBI sufficient authority to monitor its whereabouts, even

outside of Indiana. While Defendant likens the placement of the GPS device on his car to an authorization to search for an item inside a dwelling in places particularly described in a warrant, a state magistrate's limitation that the GPS device be used to track the car in Indiana is not the same. As far as the Constitution is concerned, the particularity here is the car, not the state of Indiana.

This is consistent with the jurisprudence in the Seventh Circuit. In *United States v. Castetter*, 865 F.3d 977 (7th Cir. 2017), defendant moved to suppress evidence found when police used information from a tracking device outside of Michigan, where the warrant for the tracking device was issued. As Defendant "saw things, Michigan's police lacked authority to monitor the location of a car [outside the state], no matter what the Michigan warrant says." *Castetter*, 865 F.3d at 978. But the Court of Appeals found no merit in this argument:

> The problem with [defendant's] principal argument is that the Fourth Amendment does not concern state borders. It reads: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Nothing there about state lines. The Constitution demands that a warrant be supported by probable cause, an oath, and particularity.

*Id.*

For these reasons, the Court denies Defendant's motion to suppress the information derived from the GPS tracker outside of Indiana.

### *(2) The traffic stop in Omaha*

Defendant likewise wants to suppress any evidence derived as a result of the traffic stop in Omaha. He claims that under Nebraska law, he committed no traffic violation and thus should not have been stopped. He also insists that Officer Vaughn should not have relied on Nacho's

alert to search the car for narcotics because Nacho wasn't a reliable dog. Next, he wants to suppress the statements he made to Officer Vaughn while sitting in the police cruiser. Lastly, Defendant believes that, even if the search was justified, taking pictures of the contents of the car exceeded the allowable scope once the drugs weren't located.

Defendant claims that Officer Vaughn had no probable cause to stop him because crossing the boundaries of the lane in which he was travelling didn't constitute a violation of Nebraska law. He relies upon a Nebraska Supreme Court decision in *State v. Au*, 829 N.W.2d 695 (Neb. 2013), which held that a police officer had no probable cause to stop a motorist who was merely touching or crossing the divider line. The Nebraska Supreme Court held that the Nebraska statute upon which Officer Vaughn relied in stopping Defendant must be considered in light of the totality of the circumstances and when considered as such, the officer who stopped Mr. Au could not have believed that its provision requiring that the car be driven "as nearly as practicable within a single lane" was violated. The Court based its decision upon the following considerations:

> [Police officer's] testimony failed to establish that the vehicle was not driven "as nearly as practicable" in the right-hand lane. He admitted that just before crossing the line, the vehicle crossed a "break in the road," and that the pavement there was a "little bit" uneven. He also acknowledged that the vehicle was traveling around a curve and that it is "more difficult" to maintain one's lane when driving around a curve as opposed to going straight. But he failed to explain how, in the light of these circumstances, it was still feasible for the vehicle to not touch or slightly cross the line. Instead, he evidently assumed that any touching or crossing of the lane divider line necessarily constituted a traffic infraction.

*Id.* at 700.

No such circumstances existed in Officer Vaughn's case. His testimony didn't describe any obstacles, uneven surfaces, curves in the road, or traffic conditions that might have made one veer outside one's lane by necessity. Rather, the portion of the highway where Defendant's

alleged traffic violation took place appears to have been straight and road conditions were normal. Hence this case is distinguishable from *Au*. Moreover, the issue in suppression cases is not whether one could have been convicted of the alleged violation but whether there was probable cause to believe that a traffic law had been violated. Here it seems that there was such probable cause.

Defendant also argues that Nacho is an unreliable dog and that Officer Vaughn should not have searched his car upon Nacho's alert. Defendant's argument is unconvincing. Nacho is a certified narcotics search dog and there's no evidence that it has a dismal record of searches, so as to make it unreliable. During the stop, its demeanor (lifting the nose toward the open window and sitting down) indicated an alert for narcotics. That gave sufficient basis for Officer Vaughn to search Defendant's car. The fact that pictures were taken of some items located in the car changes nothing about the validity of that search.

Finally, there's no need to exclude any of Defendant's statements to Officer Vaughn. Defendant wasn't in custody and Officer Vaughn's questions didn't exceed the scope of his duties. In fact, Defendant provides no case law showing that his statements to Officer Vaughn should be excluded from trial.

### *(3) Custodial Statement in Los Angeles*

Defendant believes that FBI agents Bauman and Peasley violated his *Miranda* rights by questioning him on June 10 and 11 while he was held in police custody. He maintains that all questioning should have stopped when on both days he expressed his reluctance to talk (Defendant categorizes his actions as absolute expressions of desiring to remain silent).

The Court finds no *Miranda* violations. On both days, Defendant refused to sign the *Miranda* notice but continued to talk. While initially he seemed to indicate a desire to stop the conversation, upon both agents asking for clarification on his intentions, he indicated his willingness to continue. During the June 10 interview, his issue was with signing the *Miranda* notice; that is, he was adamant that he wouldn't sign it, but had no problem with talking. On June 11, he insisted that there was nothing to talk about because he had already talked the day before, but upon clarification from Agent Peasley that he was from Indiana and that the conversation would be about the events in Indiana, Defendant acceded to continue with the conversation. There's nothing in either interview to suggest that the agents overpowered Defendant's will or somehow tricked him into continuing the interviews. Rather, Defendant appeared to have been aware of his rights and his occasional defiant stances cannot be construed as unequivocal requests to end the interviews.

For these reasons, the Court denies Defendant's motion to exclude the Los Angeles custodial interviews from evidence at trial.

### *(4) Pretrial identification*

Defendant argues that showing his pictures to the Horizon Bank employee from surveillance cameras of other banks was unduly suggestive, unnecessary, and ultimately made the identifications unreliable.

Defendant's argument ignores the facts. There was a spree of bank robberies in Northwest Indiana and the FBI was investigating whether there were any links between them. When the FBI agents showed the Horizon Bank employee pictures of the suspect from other bank robberies, they did not know who he was. They showed his pictures after getting an assurance from the

employee that she had had a good opportunity to observe the person who came to the bank acting suspiciously and that she would recognize him if she saw him again. This wasn't a case of police officers bringing the suspect in handcuffs to the bank lobby so as to risk undue influence upon the witness.

In addition, the employee's identification was corroborated when FBI retrieved the images of the suspect in other bank robberies from Horizon Bank's surveillance system from around the time identified by the employee. In fact all the factors for reliable identification—the witness's opportunity to observe the suspect, the witness's degree of attention, the accuracy of the description, the level of certainty, the length of time between the crime and the identification, *see Lee v. Foster*, 750 F.3d 687, 692 (7th Cir. 2014)—suggest that the bank employee was in a position to confirm if the suspect in the other bank robberies was the same person who acted suspiciously the day before. *See Simmons v. United States*, 390 U.S. 377, 384–385 (1968) (discussing the factors for ascertaining whether identification procedures are reliable).

For these reasons, the Court denies Defendant's motion to preclude identification evidence from trial.

In summary, the Court denies all of Defendant's motions to suppress (DEs 27, 28, and 36).

SO ORDERED on December 7, 2017.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE